**UNITED STATES of America,
Plaintiff,**

v.

**AGWAY, INC.; Agway Energy Products, LLC, successor to Agway Petroleum Corp.; General Electric Co.; Metal Working Lubricants Company; Nycomed, Inc.; and Schenectady International, Inc., Defendants.**

No. 1:99–CV–708.

United States District Court,
N.D. New York.

March 28, 2002.

United States Department of Justice, Environmental and Natural Resources Division, Washington, D.C., Patricia A. McKenna, Esq., of counsel, for the United States.

Whiteman Osterman & Hanna, Albany, NY, Philip H. Gitlen, Esq., of Counsel, for Defendant Schenectady International, Inc.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

### I. INTRODUCTION

In May 1999, the United States commenced the present action against Schenectady International, Inc. and six other Defendants.[1] The United States seeks reimbursement of the costs it incurred for a removal action it undertook at the Friedrichsohn's Cooperage, Inc. site, in Waterford, New York (the "Site"). The removal action included, among other things, sampling and disposal of drums; disposal of hazardous substances, including waste liquids and sludges found in the buildings on-Site; installing absorbent booms and pads to limit migration of hazardous substances from the basement of one of the on-Site buildings; removal of asbestos and debris; and demolishing the buildings on-Site. The Environmental Protection Agency ("EPA") analyzed and disposed of numerous drums containing hazardous substances, including, among other things, acetone, ethylbenzene, styrene, xylene, phenol, 2–methylphenol, 4–methylphenol, 2,4–dimethlphenol, naphthalene, toluene, lead and mercury.

Schenectady had an on-going relationship with Friedrichsohn's Cooperage, Inc. from 1963–1989. Moreover, Schenectady admits sending hazardous substances, such as cresol-xylene mixtures, phenolic resin solutions, phenol, triethanolamine, and cresol, to the Site. The Court has already determined that because of this arrangement Schenectady is liable as an arranger under Section 107 of the Comprehensive Environmental Response, Compensation

---

1. All Defendants except for Schenectady have entered into a partial consent decree lodged on November 19, 1999, resolving their liability to the United States.

and Liability Act ("CERCLA"), 42 U.S.C. § 9607. Thus, the only issue that remains for the Court to resolve is the amount of the United States' response costs which Schenectady must pay.

Presently before the Court is the United States' motion for partial summary judgment, which seeks an order holding Schenectady jointly and severally liable for the following costs: (1) all EPA's unrecovered response costs at the Site, including prejudgment interest; and (2) all Department of Justice enforcement costs, including interest, related to this action. According to the United States, these costs equal $2,020,238.19.[2]

In opposition to the United States' motion for partial summary judgment, Schenectady does not contest that it bears some liability for the United States' response costs at the Site or that the United States' response costs are inconsistent with the NCP.[3] Rather, the sole basis for Schenectady's opposition to the United States' motion is its assertion that its liability should be limited by the common law doctrine of divisibility and apportionment so that it is only responsible for that part of the United States' response costs equal to its relative "volumetric contribution" of barrels to the Site; i.e., the number of barrels it sent to the Site for reconditioning.

The Court heard oral argument in support of, and in opposition to, the United States' motion on July 27, 2001, and reserved decision at that time. The following constitutes the Court's determination of the pending motion.

## II. DISCUSSION

Under Section 107(a)(4)(A) of CERLCA, liable parties must pay "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). The National Contingency Plan ("NCP") is a federal regulation promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, which, *inter alia*, outlines procedures and criteria that EPA must use in selecting response actions. *See* 40 C.F.R. Part 300 *et seq.*

■ "Although joint and several liability is generally imposed in CERCLA cases, it is not mandatory." *United States v. Broderick Inv. Co.*, 862 F.Supp. 272, 276 (D.Colo.1994). A limited defense is available to defendants who have been found liable for response costs based upon the common law doctrine of divisibility of harm.[4] *See id.* To determine whether

2. EPA has incurred $1,620,603.11 in unreimbursed response costs at the Site through July 15, 2000, for personnel costs and through July 20, 2000 for all other costs. In addition, prejudgment interest in the amount of $296,718.58 has accrued on those costs through October 31, 2000. The Department of Justice incurred enforcement costs of $97,481.73 through July 29, 2000, with prejudgment interest of $5,434.77 calculated on those costs through August 31, 2000.

3. In its Rule 7.1(a)(3) Response Statement, Schenectady states that it lacks knowledge to attest to the accuracy or fairness regarding some of the United States' costs, cost summaries, and its cost summaries, and its costs accounting process due to the general lack of detail provided regarding these costs. *See* Response Statement at ¶¶ 17, 36. However, nowhere in its memorandum of law does Schenectady provide any support for these assertions. In addition, it is clear from the United States' submissions that it has provided Schenectady with more than sufficient detail to ascertain the accuracy and fairness of those costs.

4. If the harm is determined to be indivisible, liability is joint and several unless the defendant can establish the existence of one of the three affirmative defenses enumerated in § 9607(b), none of which apply here. *See United States v. Township of Brighton*, 153

joint and several liability is appropriate under the circumstances, courts rely upon common law principles and in doing so have turned to the Restatement (Second) of Torts for guidance.[5]

"A defendant advancing a divisibility defense under CERCLA ... must prove either (1) that there are distinct harms or (2) that there is a reasonable basis for determining the contribution of each cause to a single harm (a so-called "divisible harm")." *Hatco Corp. v. W.R. Grace & Co.—Conn.,* 836 F.Supp. 1049, 1087 (D.N.J.1993). Moreover, "[a] defendant asserting a divisibility defense has the burden of proof as to that defense, and its burden is substantial." *Id.* (citations omitted). As once court has noted, "CERCLA's joint and several liability rule is tough on defendants because 'Congress had well in mind that persons who dump or store hazardous waste sometimes cannot be located or may be deceased or judgement-proof.'" *Memphis Zane May Assocs. v. IBC Mfg. Co.,* 952 F.Supp. 541, 548 (W.D.Tenn.1996) (quoting *Shore Realty,* 759 F.2d at 1045). Nonetheless, "a defendant can avoid joint and several liability by showing the harm is capable of being divided among its various causes, for example by presenting evidence of the relative toxicity, migratory potential, degree of migration or 'synergistic capacities' of the hazardous substances at issue." *Id.* (citing *Alcan,* 990 F.2d at 722; *United States v. Broderick Inv. Co.,* 862 F.Supp. 272, 276 (D.Colo.1994)). To defeat a motion for summary judgment on the issue of divisibility, a defendant "need only show that there are genuine issues of material fact regarding a reasonable basis for apportionment of liability." *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 722 (2d Cir.1993).

Basically, "the question whether there is a reasonable basis for apportionment depends on whether there is sufficient evidence from which the court can determine the amount of harm caused by each defendant." *In the Matter of Bell Petroleum Servs., Inc.,* 3 F.3d 889, 903 (5th Cir.1993). "The preliminary issue of whether the harm to the environment is capable of apportionment among two or more causes is a question of law." *United States v. Hercules, Inc.,* 247 F.3d 706, 718 (8th Cir. 2001) (citation omitted). "If the expert testimony and other evidence establishes a factual basis for making a reasonable estimate that will fairly apportion liability, joint and several liability should not be imposed in the absence of exceptional circumstances." *In the Matter of Bell Petroleum,* 3 F.3d at 903. Moreover, "[t]he fact that apportionment may be difficult, because each defendant's exact contribution to the harm cannot be proved to an absolute certainty, or the fact that it will require weighing the evidence and making credibility determinations, are inadequate grounds upon which to impose joint and several liability." *Id.* (footnote omitted).

Courts have held that "single harms," such as the one at issue here, may be

---

F.3d 307, 318 n. 12 (6th Cir.1998); *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2d Cir.1993).

**5.** Section 433A of the Restatement provides that

(1) Damages for harm are to be apportioned among two or more causes where
 (a) there are distinct harms, or
 (b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes. Similarly, Section 881 of the Restatement sets forth the affirmative defense based upon the divisibility of harm rule in Section 433A:

If two or more persons, acting independently, tortiously cause distinct harms or a single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.

"treated as divisible in terms of degree," based on the relative quantities of waste discharged. *See Hercules,* 247 F.3d at 718 (citation omitted). "Divisibility of this type may be provable even where wastes have become cross-contaminated and commingled, for "commingling is not synonymous with indivisible harm.'" *Id.* (quotation and citation omitted). However, defendants like Schenectady face an uphill battle in attempting to demonstrate that volumetric contribution is a reasonable basis for apportioning liability of a single harm. As the Fourth Circuit noted in *United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988), "[v]olumetric contributions provide a reasonable basis for apportioning liability **only** if it can be reasonably assumed, or it has been demonstrated, that independent factors had no substantial effect on the harm to the environment." *Id.* at 172 n. 27 (citation omitted) (emphasis added).

Likewise, in *United States v. Odabashian,* No. 95–2361 G/BRE (W.D.Tenn. May 18, 1999), the court granted the United States' motion for summary judgment with respect to the recovery of response costs in the face of a challenge by the defendants that damages should be assessed on a "volumetric" basis. The court found that volume was not an adequate indicator of harm because it failed to take into account "the relative toxicity, migratory potential, or effect of commingling of different hazardous substances. This is particularly important in cases such as this one where chemicals have commingled." *Id.* at 23–24 (citing *Monsanto,* 858 F.2d at 172 n. 26). The court also noted that the defendants had presented no evidence to demonstrate the relationship between the volume of methoxychlor shipped, the release of methoxychlor and the harm at the site. *See id.* at 24.

In the present case, Schenectady contends that apportionment based upon its relative volumetric waste contribution to the Site is a reasonable basis for divisibility because (1) environmental concerns regarding relative toxicity, migratory potential, or synergistic capabilities played no role in the removal costs incurred at the Site; (2) the costs of the removal remedy at the Site were driven solely by the mere existence and volume of waste there, in conjunction with the physical conditions at the Site; and (3) waste which originated with Schenectady did not have any marginal environmental impact in excess of that caused by other parties' waste generally. *See* Schenectady's Memorandum of Law at 11.

In further support of this argument, Schenectady asserts that its expert, Dr. Robert Harris, has opined that the harm associated with the disposal of the barrels at the Site and removing the liquid sludge found at the Site is not based upon environmental concerns such as relative toxicity or migratory potential. In this regard, Dr. Harris testified at his deposition that

The description of the site and the description of the removal action indicated that the presence of hazardous substances, including the nature of the buildings, was the harm that was being addressed; and that the removal action was fashioned to remove the materials under the assumption that they may represent an unreasonable risk from either fire and explosion, from buildings caving in and resulting in sudden releases, foundations crumbling and buildings and contents migrating into the canal and, therefore, the presence of the material at the site was the harm which was being addressed by the removal action. It was not dependent on relative toxicity, migratory potential, synergistic effects, but simply the potential of the material at the site and the potential exposure that could occur resulting from the acts which I just described.

*See* Transcript of Deposition of Robert H. Harris, Ph.D., dated February 28, 2001 ("Harris Tr.") at 90–91, attached as Exhibit "11" to the Affidavit of Philip H. Gitlen, sworn to May 15, 2001 ("Gitlen Aff.").

Moreover, Dr. Harris opined that the harm is divisible based upon an apportionment by the relative number of barrels sent to the Site by the various parties "given the nature of the types of contamination, their residual barrels, not barrels full but residuals in barrels[.]" *See* Harris Tr. at 109–10. In sum, based upon his opinions (1) that the waste at the Site was indistinguishable in terms of its relative toxicity or other environmental impact, (2) that removal costs are a direct function of the volume of barrels at the Site (and the layout of the Site), and (3) that available information provides a reasonable basis for determining the relative volumetric contributions by the parties, Dr. Harris concludes that volumetric contribution of barrels provides a reasonable basis for apportionment of Site removal costs. *See* Expert Report of Robert H. Harris, Ph.D., dated November 2000 ("Harris Rpt."), at II–3, attached as Exhibit "12" to Gitlen Aff.

Finally, Schenectady asserts that the United States' own actions imply that drum volume is a reasonable basis upon which to apportion the harm at the Site. In this regard, Schenectady relies upon the United States' various waste-in lists detailing the number of barrels contributed by each party and the corresponding percentage of the total that each party contributed. *See* Schenectady's Memorandum of Law at 16. In further support of this argument, Schenectady notes that the United States settled with parties for an amount equal to the percentage of its removal costs and that the EPA's 1999 Administrative Order on Consent does not refer to relative toxicity, migratory potential, or synergistic capacities as a basis for determining settlement allocations. *See*

*id.* Therefore, Schenectady concludes that Dr. Harris' opinion coupled with the United States' own actions raise sufficient issues of fact as to a reasonable apportionment of costs based upon barrel volume.

In response to Schenectady's arguments, the United States asserts that the number of barrels sent to the Site is not a reasonable basis for apportionment because the Site contained different types of wastes which were commingled. Moreover, the United States claims that Schenectady has failed to establish a material issue of fact because it has presented no evidence regarding the relative toxicity, migratory potential, and synergistic capacities at issue. Instead, the United States contends that Schenectady is attempting to shift the burden to the United States by asserting that because the EPA did not consider these factors in performing the removal action they are not necessary elements to proving divisibility.

Furthermore, the United States explains that apportionment by volume is not reasonable because this suggests that the harm may be apportioned by reference to what was sent to the Site, implying that drums were found at the Site in neatly stacked rows with labels and that none of those containers ever leaked or were emptied. However, according to the United States, that is not what the EPA found on the Site. Instead, the United States asserts that the EPA's removal action was not limited to the removal of drums; rather, it addressed, *inter alia,* disposal of other hazardous substances on-Site, including waste liquids and sludges found in the buildings ...' installing absorbent booms and pads to limit migration of hazardous substances ...; removal of asbestos and debris; and demolishing the buildings on-Site. In addition, the basement of building three was filled with approximately four feet of an oily liquid/sludge mixture and

also contained drums. *See* United States' Reply Memorandum of Law at 5. Site photographs also show pools of oily hazardous liquid in the basement and the liquid leaking through the foundation of the buildings. They also illustrate that many drums were found deteriorating, in poor condition, and without identifying labels on them. For all these reasons, the United States contends that relying on the number of drums sent to the Site is not an appropriate or accurate way of dividing the harm. *See id.*

Additionally, the United States explains that volumetric analysis does not take into account: (1) the relative toxicity posed by various hazardous substances at the Site; (2) whether certain substances spilled or leaked more than others; (3) whether the clean-out of residues from certain substances was more or less present on-Site when EPA conducted its removal action; (4) whether certain costs were incurred irrespective of volume; and (5) whether the costs of removing defendants' hazardous substances were the same or different from the cost of removing other parties' substances. *See id.*

Furthermore, the United States questions Schenectady's reliance upon the opinion of its expert Dr. Harris. According to the United States, Dr. Harris is not qualified to testify regarding whether the harm is divisible. *See* United States' Reply Memorandum of Law at 7 n. 8 (citing *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). The United States bases its argument on the following: (1) Dr. Harris admits that he has no knowledge of the amount of residual wastes contained in Schenectady's drums (Harris Tr. at 77); (2) Dr. Harris is

not even sure if other generators sent hazardous wastes to the Site (Harris Tr. at 139); (3) Dr. Harris did not speak to any EPA employees or Cooperage employees who witnessed the drums present at the Site (Harris Tr. at 56); (4) Dr. Harris has no understanding as to how many drums were sent to the Site other than EPA's waste-in list (Harris Tr. at 71); and (5) Dr. Harris never even reviewed the Cooperage records upon which EPA relied to draft the waste-in lists (Harris Tr. at 84). *See id.*

The United States also asserts that there is no evidence that the waste-in lists that the EPA prepared provide a reasonable basis for apportioning the harm at the Site.[6] According to the United States, those lists were prepared for settlement purposes only and were not designed to address, and do not in fact address, the requirements of divisibility. *See* United States' Reply Memorandum of Law at 8. Moreover, the waste-in lists do not take into consideration the amount of waste contained in the drums, the toxicity or other material characteristics of the waste or the actions EPA undertook to clean up the Site. *See id.* The United States further explains that the waste-in lists do not provide a reasonable basis for apportionment because EPA's removal action was not limited to the removal of the intact drums. *See id.* at 9.

Finally, the United States asserts that Schenectady's argument is based on the erroneous assumption that since EPA prepared waste-in lists that formed the basis for settlement negotiations and an administrative settlement, these actions prove that the harm at the Site is divisible. *See*

**6.** In *United States v. Ben Shemper & Sons, Inc.,* 94–50385/LAC, 22–23 (N.D.Fla. Oct. 2, 1997), which involved a summary judgment motion, the court specifically rejected the defendant's argument that the Site was subject to a reasonable basis of apportionment on the basis of waste-in lists that EPA had prepared and used for settlement purposes to show how many pounds of batteries each defendant had contributed.

*id.* The United States claims that this argument is unavailing and is contrary to Congress' intent to encourage prompt and efficient settlements. *See id.*

■ Although in some instances, volume might constitute a reasonable basis for apportionment, the Court finds that this is not such a case. There is no dispute that the present case involves the presence of a single harm in which the chemicals contained in Schenectady's barrels became commingled with the chemicals contained in the barrels of others who shipped barrels to the Site. Thus, despite Schenectady's arguments to the contrary, the relative toxicity, migratory potential, degree of migration and "synergistic capacities" of the hazardous substances deposited at the Site are important to the Court's determination of whether the harm is divisible.

Schenectady has presented no evidence about these factors and, in fact, has indicated that it does not intend to do so, other than to demonstrate that these factors had no effect on the costs that EPA incurred.[7] *See* Transcript of Motion Argument, dated July 27, 2001, at 16 ("[Schenectady] believe[s] that if the wastes that were at the Site did not in any material way vis-a-vis their toxicity, migratory potential or synergistic effects impact the costs, then I believe that the harm can be divided on the basis of volume[.]"). Therefore, based upon Schenectady's total failure to produce any evidence regarding any of the factors relevant to the issue of divisibility as well as any proof to support its argument that volume alone is a reasonable basis for apportionment, the Court concludes that Schenectady has failed to meet its burden of proof with respect to its divisibility defense. Accordingly, the Court grants the United States' motion for partial summary judgment holding Schenectady jointly and severally liable for its costs in the amount of $2,020,238.19.

## III. CONCLUSION

After carefully considering the file in this matter, the parties' submissions and oral arguments and the applicable law and for the reasons stated herein, the Court hereby

**ORDERS** that the United States' motion for partial summary judgment, holding Schenectady jointly and severally liable for the following costs (1) all EPA's unrecovered response costs at the Site, including prejudgment interest; and (2) all Department of Justice enforcement costs, including interest, related to this action, in the amount of **$2,020,238.19**, is **GRANTED**; and the Court further

**ORDERS** that Schenectady is to contact Magistrate Judge DiBianco's Court Room Deputy within **twenty days** of the date of this Order to schedule a status conference. **IT IS SO ORDERED.**

---

7. Although Schenectady's arguments have some surface appeal, the Court notes that case law does not support Schenectady's reasoning in situations similar to the one present in this case.