# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1468

_____

| | |
|---|---|
| Morrison Enterprises, LLC, | * |
| | * |
| Plaintiff/Appellant, | * |
| | * |
| City of Hastings, Nebraska, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| Dravo Corporation, | * |
| | * |
| Defendant/Appellee. | * |
| | * |
| | * |
_____

| | |
|---|---|
| United States, | * |
| | * |
| Amicus on Behalf | * |
| of Appellee. | * |

_____

No. 10-1469

_____

Appeals from the United States
District Court for the
District of Nebraska.

| | |
|---|---|
| Morrison Enterprises, LLC, | * |
| | * |
| Plaintiff, | * |
| | * |

City of Hastings, Nebraska,    *
             *
    Plaintiff/Appellant,  *
             *
    v.         *
             *
Dravo Corporation,     *
             *
    Defendant/Appellee. *
             *
             *
_____   *
             *
United States,      *
             *
    Amicus on Behalf  *
    of Appellee.    *

_____

Submitted: November 17, 2010
Filed: April 5, 2011

_____

Before RILEY, Chief Judge, MELLOY and GRUENDER, Circuit Judges.

_____

RILEY, Chief Judge.

Morrison Enterprises, LLC (Morrison) and the City of Hastings, Nebraska (City) (collectively, appellants), and Dravo Corporation (Dravo) are liable within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended, 42 U.S.C. § 9601 et seq., for hazardous substances released at the Hastings Ground Water Contamination Site (Site). Appellants each sued Dravo under § 107(a) of CERCLA, 42 U.S.C. § 9607(a), seeking to recover some of the costs they incurred responding to contaminated ground

water at the Site. The district court[1] denied appellants' motions for summary judgment and granted summary judgment to Dravo on appellants' cost-recovery claims. The district court held (1) CERCLA § 113(f), 42 U.S.C. § 9613(f), provided appellants' exclusive remedy to recover response costs incurred removing contaminants from the City's ground water, and (2) the City's water supply system claims were untimely. We affirm.

## I.    BACKGROUND
### A.    Facts

In 1983, the City attempted to restore a long-closed water production well to service, but immediately received complaints about the water's foul taste and odor. Responding to the complaints, the Nebraska Department of Health (NDOH) and the United States Environmental Protection Agency (EPA) began investigating contamination in the City's wells. On June 10, 1986, the EPA added the Site to the National Priority List (NPL).[2]

In 1985 and 1986, the EPA notified a number of entities, including Morrison, the City and Dravo, that they were potentially liable under CERCLA for releases and threatened releases of hazardous substances at the Site. The EPA determined the contamination at the Site originated from seven source areas, or subsites, three of which are relevant to these appeals: the FAR-MAR-CO Subsite, the Colorado Avenue Subsite and the North Landfill Subsite. Hazardous substances from each of the subsites entered the City's ground water and were remediated in part by the operation of the "Well-D system" (Well-D), a ground water extraction and treatment system

---

[1]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

[2]The NPL is a list of national priorities among the known releases or threatened releases of hazardous substances throughout the United States, and serves to identify those sites or releases that appear to warrant further investigation and remedial action. See 42 U.S.C. § 9605(a).

located at the FAR-MAR-CO Subsite, down gradient of the relevant sources of contamination at all three subsites.

The EPA identified Morrison as potentially liable at the FAR-MAR-CO Subsite for response costs necessary to remediate releases of hazardous substances at a grain elevator owned and operated by one of Morrison's predecessors. Dravo and others were identified as potentially liable at the Colorado Avenue Subsite for releases of trichloroethylene (TCE) and other volatile organic compounds (VOC) in connection with the use of a solvent containing TCE as a degreaser in manufacturing operations at the site. The City, Dravo, and others were identified as potentially liable for releases of TCE and other contaminants of concern (COC) at the North Landfill Subsite, a former landfill operated by the City. During the City's operation of the landfill, Dravo disposed of industrial waste containing TCE there.

### 1. FAR-MAR-CO Subsite

In 1991, Morrison entered into the first of a series of administrative settlements with the EPA, known as administrative orders on consent (AOC), pursuant to which Morrison agreed to perform designated clean-up activities at the FAR-MAR-CO Subsite. In 1996, Morrison entered into a second AOC, pursuant to which Morrison agreed to operate Well-D to extract and treat ground water at the FAR-MAR-CO Subsite and reimburse the EPA for response costs incurred at the subsite.

One stated purpose of the 1996 AOC was to reduce three specific COCs found in ground water at the FAR-MAR-CO Subsite at concentrations hazardous to human health and the environment—TCE, carbon tetrachloride (CT), and ethylene dibromide (EDB). Having been found a "liable party" by the EPA within the meaning of § 107(a), Morrison agreed to finance and operate Well-D to remove each of those COCs. Well-D has been operating since 1997. Morrison maintains it has never used or released TCE anywhere within the Site and that the FAR-MAR-CO Subsite has never been identified as a source of TCE.

In September 2007, the EPA issued a record of decision for the FAR-MAR-CO Subsite requiring the extraction of contaminated ground water at Well-D. On July 29, 2008, the EPA filed a civil action in the district court against Morrison under §§ 106 and 107, seeking an order compelling Morrison to operate Well-D and reimburse the EPA for response costs incurred at the FAR-MAR-CO Subsite. In a consent decree filed October 8, 2008, the EPA and Morrison resolved Morrison's potential liability for contamination at the Site under §§ 106 and 107. The 2008 consent decree continued to rely on Well-D as the primary method of cleaning ground water at the subsite.

In addition to contaminants originating at the FAR-MAR-CO Subsite, ground water extracted and treated at Well-D contains TCE and other contaminants originating at the Colorado Avenue and North Landfill Subsites. In agreements dated June 1995 and July 1997, Morrison, the City, and one other party agreed to coordinate efforts and allocate certain costs associated with the investigation and cleanup of releases of hazardous substances from the North Landfill and FAR-MAR-CO Subsites. Under those agreements, the City contributed to the construction and operation of Well-D. Dravo did not join those agreements.

### 2. North Landfill Subsite

In October 1992, the City entered into an AOC with the EPA pursuant to which the City agreed to undertake certain response actions at the North Landfill Subsite. In 1998, the EPA sued the City and Dravo under §§ 106 and 107. On August 13, 1998, the City and Dravo jointly entered into a consent decree with the EPA to perform a source-control remedial action at the North Landfill Subsite. Following a second suit by the EPA in 2007, the City and Dravo entered a second consent decree requiring the City and Dravo to participate in operating Well-D to contain the migration of VOCs in the City's ground water and to coordinate efforts with the responsible parties at the FAR-MAR-CO Subsite. The 2007 consent decree also

requires the City and Dravo to pay the EPA's response costs and provides contribution protection to the settling parties.

### 3. Colorado Avenue Subsite

In 1993, the EPA issued a unilateral administrative order requiring Dravo to remediate soil and ground water contamination at the Colorado Avenue Subsite. Several of the City's water production wells are within the vicinity of the Colorado Avenue Subsite and were contaminated with TCE. At the recommendation of the NDOH, the City removed the contaminated wells from service and relocated parts of its water supply system by installing new wells, mains, and related improvements. Though the exact date is unknown, the City began its ongoing efforts to provide alternative water supplies at least as early as 1986.

On September 27, 2001, the government sued Dravo under § 107(a) to recover costs incurred in response to the release of hazardous substances at the Colorado Avenue Subsite. See United States v. Dravo, No. 8:01CV500 (D. Neb. filed Sept. 27, 2001). On November 26, 2001, Dravo joined the City as a third-party defendant, seeking contribution from the City for the federal government's response costs. The City asserted counterclaims against Dravo for contribution. The City alleged the hazardous substances released by Dravo migrated and contaminated the City's ground water, requiring water system replacements at significant cost to the City.

On January 24, 2006, Dravo and the City entered into a settlement and release agreement to resolve certain claims between them. As part of the agreement, the City reserved its claims against Dravo for any contamination migrating from the Colorado Avenue Subsite to other locations in the Site, including Well-D. On May 24, 2006, the district court approved a consent decree requiring Dravo to take various actions to clean up TCE contamination at the Colorado Avenue Subsite.

### B.    Prior Proceedings

On July 3, 2008, appellants filed a seven-count complaint against Dravo setting forth the following causes of action: cost recovery under § 107 (Count I); declaratory judgment under § 113(g)(2) (Count II); noncontractual indemnity (Count III); negligence (Count IV); private nuisance (Count V); public nuisance (Count VI); and trespass (Count VII). Appellants jointly brought Counts I and II.  Morrison brought Count III alone, and the City brought Counts IV-VII alone.  Neither Morrison nor the City brought a claim for contribution under § 113(f).  In its answer, Dravo pled as its second affirmative defense that appellants could not recover under § 107 because "their claims [were] for contribution."  Appellants moved to strike the defense, arguing Dravo's defense would only confuse the issues.

On November 6, 2008, the district court denied the motion, noting there were material disputed factual issues regarding the source of TCE at Well-D.  The district court also stated Morrison had failed to establish Dravo's defense was insufficient as a matter of law.  The district court's scheduling order established February 13, 2009 as the deadline for filing motions to amend the pleadings.

On February 24, 2009, appellants amended their complaint, adding a breach of contract claim (Count VIII).  Appellants brought Counts I-III jointly and the City brought Counts IV-VIII alone.  Appellants did not include a contribution claim under § 113(f).

On March 6, 2009, Dravo answered the amended complaint and filed four counterclaims against appellants. Counterclaims I-III consisted of contribution and indemnification claims contingent on Dravo being found liable to appellants. Counterclaim IV alleged Dravo was entitled to reimbursement from appellants for Well-D costs incurred in connection with the North Landfill Subsite. Dravo continued to include its affirmative defense asserting appellants were barred from pursuing a § 107(a) claim.

On June 19, 2009, Dravo moved for partial summary judgment on the City's water supply system claims, arguing the City's § 107 cost-recovery claim was barred by the applicable statute of limitations. Finding the replacement of the City's water system to be a remedial action rather than a removal action under CERCLA, the district court dismissed the City's claims under Counts I and II as time-barred.[3] The district court also rejected the City's argument that the present case was a "subsequent action" for response costs because the City's purported "initial action" (a counterclaim in an earlier action) unambiguously was one for contribution only.

On July 15, 2009, Dravo again moved for partial summary judgment, this time on appellants' Well-D claims, arguing appellants could not pursue a cost-recovery action under § 107. That same date, appellants moved for summary judgment on Dravo's liability under § 107 and Dravo's counterclaims. On November 24, 2009, the district court granted Dravo's motion in part, finding § 113(f) provided appellants' exclusive remedy. The district court denied as moot appellants' motions for summary judgment with respect to Counterclaims I-III and Dravo's liability under § 107. The district court granted the City's motion for summary judgment on Counterclaim IV and Dravo voluntarily dismissed Counterclaim IV against Morrison. The City voluntarily dismissed Counts III and Count VIII.

After the district court dismissed Morrison's § 107 claim, Morrison sought leave to amend its complaint to assert a claim under § 113. The district court denied the motion, deciding Morrison failed to demonstrate good cause and did not act diligently in its efforts to meet the scheduling order. The district court entered judgment January 26, 2010. Appellants appeal the district court's summary judgment rulings on Counts I and II. Morrison also appeals denial of its motion for leave to amend.

---

[3]The district court also dismissed Counts IV-VII, which the City does not appeal.

## II. DISCUSSION

### A. Standards of Review

"We review the district court's grant of summary judgment *de novo*." Cole v. Homier Dist. Co., 599 F.3d 856, 864 (8th Cir. 2010). "Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Myers v. Lutsen Mtns. Corp., 587 F.3d 891, 893 (8th Cir. 2009). See also Fed. R. Civ. P. 56(a) (amended effective Dec. 1, 2010). We also review the district court's interpretation of CERCLA *de novo*. See Atl. Research Corp. v. United States, 459 F.3d 827, 830 (8th Cir. 2006). We review the district court's denial of Morrison's motion for leave to amend for an abuse of discretion. See Doe v. Cassel, 403 F.3d 986, 990 (8th Cir. 2005). A district court's finding of delay is subject to review for clear error. See id.

### B. Well-D

#### 1. CERCLA Framework

"Two provisions of [CERCLA]—§§ 107(a) and 113(f)—allow private parties to recover expenses associated with cleaning up contaminated sites." United States v. Atl. Research Corp., 551 U.S. 128, 131 (2007). Though complementary, "§§107(a) and 113(f) provide two 'clearly distinct' remedies," id. at 138, "to persons in different procedural circumstances," id. at 139 (quotation omitted). Section 107(a)(4)(B) permits a private party who has voluntarily incurred costs cleaning up a site for which it may be held liable to recover necessary response costs from another liable party through a direct recovery action. See id. at 133-34, aff'g Atl. Research Corp. v. United States, 459 F.3d 827 (8th Cir. 2006).

Section 113(f), enacted after § 107 as part of the Superfund Amendments and Reauthorization Act of 1986 (SARA), Pub. L. No. 99-499, 100 Stat. 1613 (1986), "authorizes one [potentially responsible party] to sue another for contribution in certain circumstances." Id. at 132. Section 113(f)(1) allows a person to seek

contribution from any other person who is liable or potentially liable under § 107(a) during or following a civil action under §§ 106 or 107. Section 113(f)(3)(B) authorizes "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement" to seek contribution from any person who has not so resolved its liability.

The term "contribution" has its traditional meaning of a "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault." Atl. Research, 551 U.S. at 138 (quoting Black's Law Dictionary 353 (8th ed. 2004)). The "right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties." Id. at 139.

The right to contribution under § 113(f) is more limited than the right to recover costs under § 107(a). See Atl. Research, 459 F.3d at 832. A person seeking contribution under § 113(f) may be subject to the equitable allocation of response costs, see § 113(f)(1), and may not recover from previously settling parties, see § 113(f)(2). Such claims are also subordinate to the rights of the United States or a State, see § 113(f)(3)(C), and subject to a shorter limitation period than cost-recovery claims, see § 113(g)(2)-(3).

To ensure the continued vitality of the precise and limited right to contribution Congress set forth in § 113, we have held the right to bring a cost-recovery action under § 107 "is available to parties who have incurred necessary costs of response, but have neither been sued nor settled their liability under §§ 106 or 107." Atl. Research, 459 F.3d at 835. "[L]iable parties which have been subject to §§ 106 or 107 enforcement actions are still required to use § 113." Id. at 836-37. See also, Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 128 (2d Cir. 2010) (holding that allowing a liable party whose claims fit § 113(f) "to proceed under §

-10-

107(a) would in effect nullify the SARA amendment and abrogate the requirements Congress placed on contribution claims under § 113"); ITT Indus., Inc. v. BorgWarner, Inc., 506 F.3d 452, 458 (6th Cir. 2007) ("To maintain the vitality of § 113(f), however, [potentially responsible parties] who have been subject to a civil action pursuant to §§ 106 or 107 or who have entered into a judicially or administratively approved settlement must seek contribution under § 113(f).").

In affirming our decision in Atlantic Research, the Supreme Court noted the potential for overlap between §§ 107(a) and 113(f), but declined to decide whether a liable party sustaining expenses pursuant to a consent decree following a suit under §§ 106 or 107(a) could recover such compelled costs under § 107(a), § 113(f), or both. Atl. Research, 551 U.S. at 139 n.6. We necessarily reach that issue in these appeals, and hold that § 113(f) provides the exclusive remedy for a liable party compelled to incur response costs pursuant to an administrative or judicially approved settlement under §§ 106 or 107. See Atl. Research, 459 F.3d at 830 n.4 (explaining our holding in Dico, Inc. v. Amoco Oil Co., 340 F.3d 525, 531 (8th Cir. 2003), that a liable party cannot bring an action under § 107 "remains viable for those parties which still have recourse to relief under § 113").

### 2. Morrison's Response Costs for Well-D

The district court determined Morrison could not use § 107(a) to recover response costs for removing TCE at Well-D because Morrison was a liable party that had been subject to a § 107 enforcement action as evidenced by the amended 1991 AOC, the 1995 AOC amendments, the 1996 AOC, and the 2008 consent decree, which obligated Morrison to operate Well-D to remove TCE and other hazardous substances.

Morrison contends the district court erred in finding Morrison could not bring a cost-recovery action because, in Morrison's view, it "voluntarily" cleaned up TCE contamination for which Dravo was legally liable. Denying any causal connection to

releases of TCE anywhere in the Site, Morrison attempts to analogize its compelled removal of TCE at Well-D to the plaintiff's voluntary clean up of hazardous substances in Atlantic Research. According to Morrison, "[b]y 'voluntarily,' the Supreme Court [in Atlantic Research] meant actions taken 'without any establishment of liability to a third party,' such as through a judgment or court order." See Atl. Research, 551 U.S. at 139. Morrison's understanding of Atlantic Research and its application here is incorrect.

Morrison ignores the terms of the AOCs by which it is bound. Unlike the voluntary plaintiff in Atlantic Research, which had never been subject to an action under §§ 106 or 107, Morrison has been sued under § 107 for releases and potential releases of hazardous substances at the FAR-MAR-CO Subsite and entered administrative settlements to resolve its liability. Notwithstanding Morrison's assertions to the contrary, the 1996 AOC specifically obligates Morrison to operate Well-D to remove TCE from contaminated ground water as a "liable party" under § 107(a). Morrison is subject to penalties if it fails to do so. Response costs incurred pursuant to such administrative settlements following a suit under § 106 or § 107(a) are not incurred voluntarily. See Atl. Research, 551 U.S. at 139 n.6. The district court correctly concluded Morrison could not maintain a cost-recovery action under § 107(a).

### 3. City's Response Costs for Well-D

The City likewise did not voluntarily incur response costs operating Well-D. As thoroughly explained by the district court, the City was subject to enforcement under §§ 106 and 107 and resolved its liability to the federal government in administrative and judicially approved settlements, including the 1992 AOC, the 1998 consent decree, the 2004 AOC, and the 2007 consent decree, culminating in the operation of Well-D to remediate contamination in the City's ground water.

Analyses of the City's ground water between 1985 and 1995 revealed contamination down gradient of the North Landfill Subsite caused by the release of TCE. Noting "the past, present or potential migration of hazardous substances currently located at or emanating from the Subsite, constitutes actual and/or threatened 'releases,'" the 1992 AOC obligated the City, as a liable party, to perform certain remedial actions at the site. The 1998 consent decree and the 2004 AOC also address the City's liability for migrating TCE. By the City's own account, the 2007 consent decree requires the City "to finance and perform the work necessary to implement the specified remedies, including continued operation of the Well-D System to contain the migration of TCE plumes." The City has not operated Well-D voluntarily.

The City contends its participation in settlements at the North Landfill Subsite does not preclude a cost-recovery action against Dravo under § 107(a). In support of this assertion, the City cites three cases, W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc., 559 F.3d 85, 91-93 (2d Cir. 2009), Kotrous v. Goss-Jewett Co. of N. Cal., Inc., 523 F.3d 924, 934 (9th Cir. 2008), and Schaefer v. Town of Victor, 457 F.3d 188, 191-92, 201-02 (2d Cir. 2006), each permitting a § 107 action.

We agree with the district court that each of the City's cases is distinguishable. Unlike the City, none of the plaintiffs in the cited cases had resolved its § 107 liability, nor entered into administrative or judicially approved settlements within the meaning of § 113(f). See W.R. Grace, 559 F.3d at 91-93; Kotrous, 523 F.3d at 927; Schaefer, 457 F.3d at 191-92. This difference deprives those cases of any persuasive value.

The City contends the district court erred in focusing on the remedy, Well-D, rather than Dravo's liability for contamination originating at the Colorado Avenue Subsite, which the City stresses is a separate "facility" under CERCLA. According to the City, each of the settlements the City entered addressed its liability at the North Landfill Subsite, not the Colorado Avenue Subsite, making the City's construction,

-13-

operation and maintenance of Well-D to clean up contamination from the Colorado Avenue Subsite voluntary.

The City's focus on specific facilities within the Site is entirely too narrow given CERCLA's comprehensive remedial purpose and broad reach. See, e.g., Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 936 (8th Cir. 1995). The term "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come[s] to be located." 42 U.S.C. § 9601(9)(B). Under § 107(a), "[l]iability is strict and is typically joint and several." United States v. Hercules, Inc., 247 F.3d 706, 715 (8th Cir. 2001). "[O]nce a party is liable [under § 107(a)], it is liable for its share, as determined by [§ 113(f)], of 'any' and all response costs, not just those costs 'caused' by its release." Control Data, 53 F.3d at 936.

Some of the releases of hazardous substances for which the City and Dravo are liable may have initially originated at different subsites, but both are responsible for the release of TCE into the City's ground water within the Site. Because the TCE contamination from the North Landfill Subsite and the Colorado Avenue Subsite has migrated to the FAR-MAR-CO Subsite, the district court correctly concluded the City must use § 113(f) to allocate responsibility for response costs incurred operating Well-D to remove TCE accumulating there.

### 4. Common Liability

In an argument closely related to Morrison's claim it voluntarily incurred response costs for TCE, Morrison contends it could not seek contribution from Dravo pursuant to § 113(f) because Morrison and Dravo released different contaminants at different facilities. In Morrison's view, because Morrison has never been subject to liability under § 107 for response costs necessary to address TCE from the Colorado Avenue Subsite or anywhere else, Morrison does not, as a matter of law, share "common liability" with Dravo necessary to support an action under § 113(f).

-14-

The City similarly argues it does not have a right of contribution against Dravo because the City is not liable for hazardous substances released at the Colorado Avenue Subsite. According to the City, neither the AOCs and consent decrees by which it is bound, nor its operation of Well-D create any common liability with Dravo because "[c]ommon liability arises out of conduct leading to an indivisible harm - not a single *solution* (i.e. the Well D System) to multiple, divisible harms."

In its amicus brief, the United States asserts appellants' interpretation "fundamentally misconstrue[s] liability under CERCLA." We agree. "Under CERCLA, if a responsible party . . . releases hazardous materials into the environment, and that release 'causes the incurrence of response costs,' then the party is liable . . . . for '*any* other necessary cost of response incurred by any other person consistent with the national contingency plan.'" Control Data, 53 F.3d at 936 (quoting 42 U.S.C. § 9607(a) (emphasis in Control Data)). "CERCLA focuses on whether the defendant's release or threatened release caused harm to the plaintiff in the form of response costs." Id. at 935; see also Hercules, 247 F.3d at 715-17 (explaining "it is enough that response costs resulted from 'a' release or threatened release—not necessarily the defendant's release or threatened release") (quoting 42 U.S.C. § 9607(a)(4)).

When multiple parties are liable for response costs, the focus then shifts to allocation. See Hercules, 247 F.3d at 715. "Allocation is a contribution claim controlled by [§ 113(f)]." Control Data, 53 F.3d at 935.

Applying the foregoing private cost-recovery framework in Control Data, a factually similar case, we affirmed the trial court's allocation of response costs between liable parties based, in part, on the relative toxicity of the distinct hazardous substances each released into the ground water at different sites. Id. at 932-34, 937-38. Control Data owned and operated a facility that inadvertently discharged trichloroethane (TCA) into ground water. Id. at 932. While testing the ground water

-15-

beneath its facility, Control Data discovered tetrachloroethylene (PERC), which had been released by Schloff Chemical at a different facility. Id. at 932-33. Control Data installed a remediation system that simultaneously removed both TCA and PERC. Id. at 933.

We held Control Data could seek contribution from Schloff for the operation of the remediation system and the investigation of the ground water contamination because, "[b]y not reacting and allowing the PERC plume to migrate, [Schloff] became partially responsible for the hazardous condition of the Control Data site." Id. at 936. We reach the same conclusion with respect to appellants' ability to seek contribution from Dravo for response costs incurred operating Well-D to remove TCE that migrated from the Colorado Avenue Subsite from the City's ground water.

As the United States points out, Well-D removes hazardous substances for which Morrison, the City and Dravo are each responsible, making them jointly and severally liable for response costs incurred to operate it. Morrison is liable for operating Well-D to remove TCE, CT and EDB which have migrated into the City's ground water at the FAR-MAR-CO Subsite. The City is liable for operating Well-D to remove TCE and other hazardous substances released at the North Landfill Subsite. And Dravo is liable for response costs to operate Well-D to remove TCE released at the Colorado Avenue Subsite. Indeed, the 2007 consent decree requires Dravo and the City to coordinate periodically with Morrison "to ensure the continued operation of Well D."

Morrison, the City and Dravo share liability for contaminating the City's ground water. They also share liability for operating Well-D to remove those contaminants. This shared liability is sufficient to support a § 113(f) contribution claim. Many of the factors appellants have raised with respect to common liability may be relevant to the proper allocation of liability and response costs among the parties but do not prevent appellants from seeking contribution from Dravo, subject

-16-

to any limitations CERCLA places on that ability.  See Hercules, 247 F.3d at 715-19 (discussing divisibility of harm); Control Data, 53 F.3d at 935 (listing factors relevant to resolving contribution claims).

### C. City's Water Supply System[4]

#### 1. Initial Action

The City asserts the district court erred in finding the statute of limitation expired before the City filed an initial action to recover response costs incurred relocating part of the City's water supply system.  The applicable statute of limitation, CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), provides

> An initial action for recovery of the costs referred to in section [107] of this title must be commenced—
>
> **(A)** for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
>
> **(B)** for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

Admitting § 113(g)(2)(B) has expired if the City's relocation of part of its water supply system beginning in the 1980s constitutes a remedial action, the City contends § 113(g)(2)(A) applies, but has not begun to run because the City's work constitutes

---

[4]The United States as amicus suggests § 113(f) provides the exclusive remedy for the City's alternative water supply system claims because the City was sued under §§ 106 and 107, but acknowledges that issue is not before us because Dravo did not argue the exclusivity of § 113(f) before the district court or on appeal.

an ongoing removal action. Determining whether a response is a removal action or a remedial action requires reference to CERCLA § 101(23)-(24), 42 U.S.C. § 9601(23)-(24). Section 101 provides in pertinent part

> **(23)** The terms "remove" or "removal" mean[] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term[s] include[], in addition, without being limited to . . . provision of alternative water supplies . . . .

> **(24)** The terms "remedy" or "remedial action" mean[] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term[s] include[], but [are] not limited to . . . provision of alternative water supplies . . . .

The inclusion of the provision of alternative water supplies in both definitions complicates the analysis. The parties agree the City's replacement of wells and mains constitutes the provision of alternative water supplies, but disagree as to which definition describes the City's actions in this case.[5]

---

[5]The City argues, for the first time on appeal, its provision of alternative water supplies cannot be a remedial action because the President has not made a determination of cost effectiveness. "Absent exceptional circumstances," not present here, "we cannot consider issues not raised in the district court." Shanklin v. Fitzgerald, 397 F.3d 596, 601 (8th Cir. 2005).

In construing the statutory language and supporting regulations, we have described removal actions as "those taken to counter imminent and substantial threats to public health and welfare," while remedial actions "are longer term, more permanent responses." Minnesota v. Kalman W. Abrams Metals, Inc., 155 F.3d 1019, 1024 (8th Cir. 1998); see also Exxon Corp. v. Hunt, 475 U.S. 355, 360 (1986) (characterizing a removal action as a "short-term cleanup" and a remedial action as "measures to achieve a 'permanent remedy' to a particular hazardous waste problem"). "Generally, a removal action costs less, takes less time, and is geared to address an immediate release or threat of release," whereas a remedial action, which "usually cost[s] more and take[s] longer," "seeks to effect a permanent remedy to the release of hazardous substances when there is no immediate threat to the public health." Pub. Serv. Co. v. Gates Rubber Co., 175 F.3d 1177, 1182 (10th Cir. 1999).

The district court concluded the ongoing activities the City performed for the provision of alternative water supplies constituted a remedial action, not a removal action under CERCLA. The district court reasoned the City's two-and-a-half decades of work were consistent with a permanent remedy for the lack of water that resulted from the closing of contaminated wells, but were not in the nature of an emergency cleanup or other interim response to an imminent threat to public health. We agree.

Although neither definition fits perfectly, we conclude the City's replacement of wells and mains more closely fits the definition of a remedial action. Having already continued for over twenty-five years, the City's ongoing relocation of part of its water supply system lacks the immediacy and relatively short duration of a removal. The City's hope, that the clean-up actions will eventually return the contaminated wells to service, does not alter our conclusion that retiring contaminated wells and obtaining uncontaminated supplies of water to meet the needs of the City's residents for the forseeable future is more in the nature of a permanent remedy.

The City contends that, in concluding the City's work on the water supply system was a remedial action, the district court improperly focused on the phrase "consistent with permanent remedy" while ignoring the phrase "to prevent or minimize the release of hazardous substances." The City asserts that because the "work on the water supply system did not clean one molecule of water or rid the environment of any contamination whatsoever," that part of the definition of remedial action does not describe water system improvements. The City's argument is unavailing.

First, the City's narrow interpretation of the term remedial action would render Congress's specific inclusion of the provision of alternative water supplies in the second sentence of the definition a nullity. By its inherent nature, the provision of alternative water supplies never cleans contaminated water, nor rids the environment of contamination. We "avoid interpreting a statute in a manner that renders any section of the statute superfluous or fails to give effect to all of the words used by Congress." Westerfeld v. Indep. Processing, LLC, 621 F.3d 819, 824 (8th Cir. 2010).

Second, shutting down contaminated wells and providing alternative water sources to prevent the City's residents from drawing and using contaminated water does "prevent or minimize the release of hazardous substances" to protect the public health and welfare. The district court did not err in finding § 113(g)(2)(B) barred the City's claims for costs incurred relocating parts of its water supply system.

### 2. Subsequent Action

As an alternative to arguing its water supply system claim is an initial removal action subject to § 113(g)(2)(A), the City contends its claim constitutes a subsequent action within the meaning of the flush language of § 113(g)(2), subject to a three-year statute of limitation that has not yet begun to run. Section 113(g)(2) provides in relevant part:

A subsequent action or actions under section [107] of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action.

The City argues the action against Dravo in <u>United States v. Dravo Corp.</u>, No. 8:01CV500 (D. Neb. filed Sept. 27, 2001), including the City's counterclaims for contribution, serves as the initial action for purposes of § 113(g)(2). More specifically, the City asserts not only that its § 113 contribution claims constitute an initial action under § 107, but also that, even in the absence of a prior claim against Dravo, the City may rely on the government's initial action against Dravo under § 107 to obtain the benefit of the longer limitation period for subsequent actions. In the City's view, there is no requirement the plaintiff be the same in the initial and subsequent actions, so any prior § 107 claim against the same defendant qualifies as an initial action regardless of the plaintiff. Both arguments are without merit.

We agree with the district court that the City's previously filed counterclaims against Dravo for declaratory judgment and contribution under § 113(f) do not constitute an initial action to recover response costs under § 107(a). Section 113(g)(2) refers to initial and subsequent actions to recover costs specifically under § 107, not contribution claims under § 113(g). In addition, as Dravo points out, § 113(g)(2)(A) and (B) each set forth a specific limitation period that applies to initial actions. Section 113(g)(3) sets forth a separate limitation period for contribution claims. Allowing a contribution claim to serve as the initial action under § 113(g)(2) would impermissibly subject the action to two different limitation periods. The City's contention conflicts with the express language and the overall scheme of CERCLA.

We likewise reject the City's unsupported contention that any prior § 107 claim against the same defendant, regardless of the plaintiff, qualifies as an initial action. Permitting any subsequent plaintiff to obtain the benefit of the longer limitation period for subsequent actions as the City proposes "would largely write the limitations restriction for initial actions out of the statute because many response actions will be

-21-

ongoing for decades." United States v. Navistar Int'l Transp. Corp., 152 F.3d 702, 710 (7th Cir. 1998) (rejecting the government's assertion § 113(g)(2) does not require the same defendant in the initial action and the subsequent action).

The City's partial relocation of wells and mains already stretches back more than twenty-five years and is expected to continue into the foreseeable future. Like the defendant in Navistar, under the City's proposed rule, Dravo could be subject to new private-party claims for decades. See id. We decline to adopt a definition of subsequent action that would discourage the timely filing of cost-recovery actions and frustrate Congress's intent "to assure that evidence concerning liability and response costs i[s] fresh . . . and to provide some measure of finality to affected responsible parties." Id. at 707 & n.7 (quoting H.R. Rep. No. 99-253 pt. 1, at 138 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2920) (internal quotation marks omitted).

**D.     Leave to Amend**

On December 1, 2009, following the district court's adverse grant of summary judgment, nine months after the February 13, 2009 deadline to file motions to amend the pleadings expired, and just two months before trial, Morrison moved for leave to amend its complaint a second time. When a party moves for leave to amend outside the district court's scheduling order, Fed. R. Civ. P. 16(b), "not the more liberal standard of [Fed. R. Civ. P. 15(a)]," governs and requires the party to show good cause to modify the schedule. Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 716 (8th Cir. 2008). "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." Id. at 716-17 (quoting Rahn v. Hawkins, 464 F.3d 813, 822 (8th Cir. 2006).

"Post-dismissal motions to amend are disfavored," In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig., 623 F.3d 1200, 1208 (8th Cir. 2010), because "[m]uch of the value of summary judgment . . . would be dissipated if a party were free to rely on one theory in an attempt to defeat a summary judgment and then, should that theory prove unsound, come back . . . and fight on the basis of some other theory." Littlefield v. City of Afton, 785 F.2d 596, 610 (8th Cir. 1986) (analyzing

-22-

Fed. R. Civ. P. 15) (quotation omitted), <u>overruled</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Lemke</u> <u>v. Cass Cnty., Neb.</u>, 846 F.2d 469, 470-71 (8th Cir. 1987) (en banc) (per curiam).

Morrison contends it demonstrated good cause to modify the scheduling order because Morrison "could not, in good faith," have brought a claim under § 113(f) against Dravo before the district court's summary judgment rulings, and it acted diligently thereafter. Morrison's assertion is not persuasive.

As the district court noted, Dravo's September 8, 2008 answer and October 9, 2008 response to Morrison's motion to strike gave Morrison ample notice Dravo contended § 113(f) provided Morrison's exclusive remedy. On November 6, 2008, the district court notified Morrison that Dravo's defense had merit. Explaining a diligent plaintiff would have made all potentially viable claims given the complexities of CERCLA, the district court determined Morrison could have reasonably offered an amended complaint before the February 13, 2009 deadline, but chose to pursue its claims under the more generous provisions of § 107(a). The district court did not abuse its discretion in concluding Morrison's tactical choice did not demonstrate diligence or good cause. Allowing Morrison to amend its complaint after Morrison's strategy failed would undermine the purpose and effectiveness of summary judgment. See <u>Littlefield</u>, 785 F.2d at 610.

Morrison also asserts the district court failed to consider the prejudice the denial of leave caused Morrison. Even if we assume, as Morrison suggests, the requirements of Fed. R. Civ. P. 15 are relevant to our analysis of good cause under Fed. R. Civ. P. 16, Morrison failed to adduce any evidence it ever advised the district court Morrison would be prejudiced. In its motion, Morrison noted only the interests of judicial economy to be served by permitting Morrison to amend its complaint rather than requiring it to file a separate lawsuit.

On appeal, Morrison claims prejudice caused by the need for this appeal, and the "possibility of the loss of its claims against Dravo" on statute-of-limitation

grounds. The mere possibility of lost claims not even mentioned to the district court falls far short of demonstrating the district court abused its discretion in denying Morrison leave to amend. See Stafford v. Ford Motor Co., 790 F.2d 702, 706 (8th Cir. 1986) (reasoning "[t]he district courts cannot be expected to consider matters that the parties have not expressly called to their attention"); cf. Adams v. AlliedSignal Gen. Aviation Avionics, 74 F.3d 882, 887-88 (8th Cir. 1996) (holding there was no abuse of discretion in refusing to extend Fed. R. Civ. P. 4 deadline even though the statute of limitation barred plaintiff's claims). The district court did not abuse its discretion in denying Morrison's motion for leave to amend.

## III. CONCLUSION

We affirm.

_____