**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 11-1697**

_____

AVX CORPORATION,

        Plaintiff – Appellant,

    v.

UNITED STATES OF AMERICA,

        Defendant – Appellee,

    and

HORRY LAND COMPANY, INCORPORATED,

        Defendant.

_____

Appeal from the United States District Court for the District of
South Carolina, at Florence.   Terry L. Wooten, District Judge.
(4:07-cv-03299-TLW)

_____

Argued:  October 23, 2012        Decided:  February 7, 2013

_____

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Diaz wrote the opinion,
in which Judge Wilkinson and Judge Keenan joined.

_____

**ARGUED:** Kevin Augustus Dunlap, PARKER, POE, ADAMS & BERNSTEIN,
LLP, Spartanburg, South Carolina, for Appellant.   Lane N.
McFadden, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Appellee.  **ON BRIEF:** Steven D. Weber, PARKER, POE, ADAMS &
BERNSTEIN, LLP, Spartanburg, South Carolina, for Appellant.

Ignacia S. Moreno, Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

––––––––––––––––

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

AVX Corporation sued the United States under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") § 107(a), 42 U.S.C. § 9607(a), seeking recovery of costs it incurred cleaning up a parcel of real estate known as the Horry Land property in Myrtle Beach, South Carolina. The United States filed a counterclaim for equitable contribution under CERCLA § 113(f), 42 U.S.C. § 9613(f). Following a bench trial, the district court concluded that the United States did not contribute to any contamination on the property.

On appeal, AVX challenges the factual findings of the district court. AVX also claims that the district court applied the wrong legal standard by (1) failing to conduct the requisite divisibility analysis under § 107(a); (2) adjudicating the United States' § 113(f) counterclaim for equitable contribution without any divisibility analysis; and (3) requiring more than circumstantial evidence to establish liability. Last, AVX argues that the district court wrongly admitted the expert testimony of a government witness. We find no error and affirm.

3

I.

A.

At the beginning of World War II, the United States constructed a military base on approximately 6,700 acres of land in Myrtle Beach, South Carolina. The Army Air Force, the precursor to the present day United States Air Force, operated the Myrtle Beach Army Air Field (the "Air Field") from 1941 to 1947. Military operations waned following the end of the war, and the United States eventually returned the land to the City of Myrtle Beach in 1947.

In the ensuing years, the land was subdivided into several parcels. The United States reacquired a portion of the land in 1954 to build and operate the Myrtle Beach Air Force Base (the "Air Force Base"). The remaining parcels were put to commercial use. The chemical contaminant at issue in this case-- tricholoroethylene ("TCE")--has been discovered on each of the parcels to varying degrees.

At trial, AVX offered two different theories to prove that the United States caused TCE contamination on the Horry Land property. First, AVX asserted that United States operations at the Air Field during World War II caused TCE contamination on all of the parcels that the Air Field formerly encompassed--

4

including the Horry Land property.[1]  Second, AVX asserted that, even after the Air Field was closed and its land subdivided, the United States caused TCE contamination on the plot of land it reacquired--the Air Force Base.  Under both theories, AVX argued that TCE material released by the United States migrated to the Horry Land property over the years.

In order to best address AVX's arguments on appeal, we give an overview of the record evidence relating to TCE contamination on the relevant parcels.

### 1. The AVX Property

From 1949 to 1986, AVX owned a twenty-acre lot on which it used TCE as a releasing agent and degreaser to manufacture ceramic capacitors.  AVX stored TCE in above-ground and underground storage tanks, and transported TCE from those tanks to its manufacturing facilities through underground pipes.  The district court found that considerable groundwater contamination occurred on the AXV property through (1) AVX's practice of disposing TCE waste directly into the soil; (2) leaks, overflows, and spills of TCE waste from AVX's underground tanks;

---

[1] At trial, the United States denied that its operations at the Air Field during World War II--which consisted primarily of recruiting and aircraft maintenance--contributed to the contamination.

5

and (3) ruptured pipes that discharged TCE waste into the soil and groundwater.[2]

From approximately 1982 to 1995, AVX tried to remediate the contamination without reporting it to either the South Carolina Department of Health and Environmental Control ("DHEC") or the Environmental Protection Agency ("EPA"). After its own efforts to stop the contamination failed, AVX finally notified DHEC of the problem in 1996. Pursuant to a subsequent "consent order" between the parties, AVX assumed responsibility for investigating and cleaning up all groundwater contamination in exchange for DHEC "covenants not to sue" under CERCLA and South Carolina environmental statutes. J.A. 1757. Upon fulfillment of the terms of the consent order, AVX's environmental liability would "be deemed as resolved between AVX and [DHEC]." J.A. 1759.

## 2. The Cinema Property

To the south of the AVX property lies a plot of land owned by Carmike Cinemas, Inc. ("Carmike") that has been used at various points as a movie theatre, an automotive repair shop, and a manufacturing facility for fiberglass camper shells. In

---

[2] In 1981, a risk assessor estimated that nearly 6,200 gallons per month of TCE waste percolated from the ground into shallow groundwater as a result of AVX's activities.

6

the late 1990s, Carmike agreed with DHEC to undertake cleanup efforts after substantial TCE contamination was discovered on the north portion of the property.  In 2000, DHEC certified that the property had been successfully and completely remediated.

### 3. Myrtle Beach Air Force Base

To the west of both the AVX and Cinema properties lies the Air Force Base that the United States military opened in 1954. Air Force Base personnel used TCE as a degreaser between 1955 and the mid-1980s, and contamination has been found on several locations at the western end of the property.  The United States contacted DHEC and EPA as soon as it discovered the contamination, and thereafter undertook remediation efforts under their supervision.  Nevertheless, the United States maintains that it has caused none of the contamination for which AVX has incurred clean-up costs.

### 4. The Horry Land Property

East of the AVX property is the principal subject of this litigation--the Horry Land property.  AVX leased the twenty-seven acre property as a parking lot from 1979 to 2005.  In July 2006, Horry Land Company, Inc.--who owned the property--learned that its property suffered significant TCE contamination, which it claimed was caused by AVX's activities on the adjoining parcel.  In August 2006 and under the power of the consent order, DHEC ordered AVX to investigate and remediate the

7

contamination on the property.  AVX has thus far expended over $1 million in remediation costs for the Horry Land property, and projects future costs of $5 million.

B.

AVX sued Horry Land under CERCLA § 107(a), seeking reimbursement of clean-up costs incurred at the Horry Land property.  Because AVX believed that chemical constituents found in the groundwater of the Horry Land property were not "consistent with materials formerly used by AVX at the AVX property," AVX concluded that Horry Land Company had been responsible for the contamination that AVX had been compelled to clean up.  J.A. 40.  In April 2009, AVX amended its complaint to join the United States as a party defendant under the theory that United States military operations--during World War II on the Air Field and afterwards on the Air Force Base--also contributed to the TCE contamination discovered on the Horry Land property.  The United States filed a counterclaim under CERCLA § 113(f)(1), for equitable contribution.  AVX and Horry Land eventually settled their dispute, leaving the United States as the sole defendant.

Following a six-day bench trial, the district court concluded that United States operations on the Air Force Base did not contaminate the Horry Land property, crediting the testimony of government expert witness Dr. Dennis O'Connell that

there was no "groundwater connection between any area west of the runways [on the Air Force Base] and the Horry Land Property" for TCE to have migrated from the base to the Horry Land property. J.A. 1592. The district court concurred with the assessment of Dr. O'Connell, which was "corroborated by the analysis of an environmental consultant retained by the Air Force and approved by DHEC and the EPA," J.A. 1623, that the hydrogeology of the area--with prevailing groundwater flow directions to the south, west, or southwest--foreclosed the possibility that any TCE contamination on the Air Force Base migrated east towards the Horry Land property.

As for the Air Field, the district court was persuaded by the expert testimony of historian Dr. Jay Brigham, who opined that TCE scarcity during World War II made it unlikely that the United States military ever used that material at the Air Field. Based on this testimony, the district court found that the United States had caused contamination only on the western portion of the Air Force Base, and had caused no contamination during World War II when it utilized the entire tract.

As a result, the district court concluded that the United States was not a "potentially responsible party" within the meaning of CERCLA. Notwithstanding its § 107(a) conclusion, the district court adjudicated the United States' § 113(f) counterclaim for contribution and determined that the relevant

9

equitable factors supported allocating 100% of the response costs to AVX.  This appeal followed.

## II.

### A.

We first address AVX's challenge to the court's decision to admit the testimony of expert witness Dr. Dennis O'Connell.  We review that decision for abuse of discretion, mindful that the district court occupies the role of "gatekeeper" to ensure expert testimony is both reliable and relevant.  See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 260-61 (4th Cir. 2005).

Under Rule 702 of the Federal Rules of Evidence, district courts may admit expert testimony by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  On appeal, AVX principally contests whether Dr. O'Connell was "qualified" to give expert testimony under

Rule 702, claiming he lacked "specialized knowledge" in the field of hydrogeological groundwater migration.

AVX challenges Dr. O'Connell's qualifications on two fronts. First, it contends that Dr. O'Connell lacked the requisite qualifications because his professional background was in sediment rather than groundwater, and that this case was his first project in which TCE was the primary chemical constituent. Second, even if Dr. O'Connell did have experience in hydrogeology, AVX argues that TCE has unique chemical properties, and as a result, only an expert with experience specific to TCE is qualified to assess its hydrogeological migration.

As to the first point, AVX undersells Dr. O'Connell's expertise. Dr. O'Connell has a Ph.D. in geology and decades of experience with hydrogeological projects at the water resources division of the United States Geological Survey and at an environmental consulting firm. Contrary to AVX's characterization, Dr. O'Connell is a groundwater expert. He merely stated that his experience as an expert witness, not as a geologist, was limited to sediment. See J.A. 352.

In fact, Dr. O'Connell had worked on many projects installing and monitoring groundwater equipment. He had extensive experience in "contaminant assessment" and understood how contaminants--including TCE--"move[] in groundwater." J.A.

11

348-50. Dr. O'Connell, therefore, had experience within the relevant field of hydrogeology and applied that expertise to assessing the groundwater contamination around the relevant Myrtle Beach properties. Cf. Cooper v. Lab. Corp. of Am. Holdings, Inc., 150 F.3d 376, 380-81 (4th Cir. 1998) (affirming district court's exclusion of expert witness who "had no experience, beyond a general knowledge of chemistry, of forensic toxicology" from testifying on the accuracy of urine alcohol testing).

AVX seeks to discredit that expertise at an even finer degree of particularity, arguing that even if Dr. O'Connell had worked in the right field, he did not have sufficient experience with the right chemical--TCE. This is too narrow a reading of the specialized knowledge requirement. "Certainly, an expert must have specialized knowledge to assist [a trier of fact] in deciding particular issues in the case," but this Court has taken care not to "read[] this requirement . . . too narrowly." Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 162 (4th Cir. 2012).

AVX does not explain why TCE's chemical properties are unique, or why Dr. O'Connell could not have accounted for these different chemical properties in his methodology. In fact, AVX does not challenge Dr. O'Connell's methodology at all. Under these circumstances, AVX fails to demonstrate that Dr. O'Connell

12

lacked the specialized knowledge to provide expert testimony on the hydrogeological migration of TCE.

We will not elaborate further on the specificity required to satisfy Rule 702, for the district court as "gatekeeper" is best situated to determine--on a case-by-case basis--how to assess witness qualifications. This is because the specialized knowledge inquiry is one of sufficient reliability, not specificity. "General" expertise may encompass multiple areas of "specialized knowledge that will assist the trier of fact[.]" Fed. R. Evid. 702; see In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994) (noting that even a "broad range of knowledge, skills, and training qualify an expert as such").

Dr. O'Connell's expertise in hydrogeology was indeed broad, but the issue is whether Dr. O'Connell could reliably apply his general experience with groundwater contamination to the particular chemical contaminant TCE. We commit "great deference" to a district court's decision on that question. United States v. Barnette, 211 F.3d 803, 816 (4th Cir. 2000). Applying that deference and our liberal construction of Rule 702's "specialized knowledge" requirement, we conclude that the district court did not abuse its discretion in admitting the testimony of Dr. O'Connell.

B.

AVX next contends that the district court applied the incorrect legal standard under § 107(a) by failing to conduct an analysis of whether the harm caused by the contamination on the Horry Land property was divisible among the United States and other parties. We disagree. In our view, any divisibility analysis would have been improper because joint and several liability does not apply to AVX's claim--which is essentially an action for contribution under § 113(f)(3)(B).[3]

---

[3] Although not addressed by the parties, we doubt whether AVX, a PRP who entered into a DHEC consent order resolving its environmental liability, may sue under CERCLA § 107(a) for cost-recovery. When squarely presented with the issue, our sister circuits have uniformly held that an action for contribution under § 113(f) is the exclusive remedy for a PRP compelled to incur response costs through a consent order with a federal or state government. See Solutia Inc. v. McWane, Inc., 672 F.3d 1230, 1236-37 (11th Cir. 2012); Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 603 (8th Cir. 2011); Agere Sys., Inc. v. Advanced Envtl. Tech. Corp., 602 F.3d 204, 229 (3d Cir. 2010); Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 128 (2d Cir. 2010). The reason for this prohibition derives from § 113(f)(2), which provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." As a result, if a settling PRP who enjoys this statutory immunity could sue successfully under § 107(a), it could foist joint and several liability upon another PRP, who would then be unable to "blunt any inequitable distribution of costs by filing a § 113(f) counterclaim," United States v. Atl. Research Corp., 551 U.S. 128, 139 (2007). In this case, however, any misstep as to the proper labeling of AVX's claim is inconsequential because AVX did not prevail on the merits.

14

CERCLA § 113(f)(1) states: "Any person may seek contribution from any other person who is liable or potentially liable under [§ 107(a)] . . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." The core elements of a CERCLA § 113(f)(3)(B) contribution claim require (1) that the plaintiff incur response costs pursuant to a consent order discharging § 107(a) liability; (2) that the defendant bears partial responsibility for those costs as a PRP under § 107(a); and (3) an equitable allocation among the parties.

Under either CERCLA § 107(a) or § 113(f), therefore, a defendant must qualify as a PRP by causing the disposal of any of the hazardous waste for which the plaintiff incurred remediation expense. But the district court reached the opposite conclusion here, finding that any TCE contamination caused by the United States "did not migrate to the Horry Land Property." J.A. 1642. This is precisely the "causation" finding that AVX claims is missing from the court's analysis, and which obviates the need for any further analysis--under either § 107(a) or § 113(f).[4] Axel Johnson Inc. v. Carroll

---

[4] Notwithstanding this conclusion, the district court still adjudicated the United States' counterclaim under § 113(f) and conducted an equitable allocation. This was unnecessary, as its
(Continued)

15

Carolina Oil Co., 191 F.3d 409, 413 (4th Cir. 1999). More importantly, AVX fails to establish that this factual finding was clear error. See Plasterers' Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 215 (4th Cir. 2011) (stating the relevant standard of review).

The district court undertook an exhaustive review of the evidence before arriving at its sound conclusion.[5] In support of its view that the United States bore no responsibility for the contamination on the Horry Land property, the district court credited: (1) Groundwater samples collected by the Air Force since the 1980s on the land that once comprised the Air Field, which detected only negligible quantities of TCE; (2) hydrogeological evidence tendered by Dr. O'Connell, which demonstrated that groundwater did not flow from the United States' properties towards the Horry Land property; and (3) "[t]he historical record," as presented by Dr. Brigham, which showed that TCE scarcity during World II rendered it unlikely

antecedent finding established that the United States did not have any CERCLA liability that would allow equitable allocation.

[5] The district court did not, contrary to AVX's assertion, incorrectly elevate the legal standard for establishing liability beyond a circumstantial showing. It acknowledged that AVX could demonstrate CERCLA liability through circumstantial evidence, but simply found that evidence insufficient. Cf. Crofton Ventures Ltd. P'ship v. G&H P'ship, 258 F.3d 292, 296, 298 n.3 (4th Cir. 2001).

16

that the material was ever used at the Air Field--"a 'sub-depot' at which only a lower level of aircraft maintenance was performed." J.A. 1616.

The bulk of this evidence came from the government's expert witnesses, whom the district court credited over AVX's experts. AVX expends much effort in its brief challenging these credibility determinations, but overlooks the principle that "[a]s with lay witnesses, evaluating the credibility of experts and the value of their opinions is also a function best committed to the district courts, and one to which appellate courts must defer[.]" United States v. Hall, 664 F.3d 456, 462 (4th Cir. 2012) (internal quotations omitted). Here, the district court analyzed each expert witness's testimony based on the reliability of its methodology and its consistency with the other evidence in the record. As a result, "we [are] especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony." Id.

AVX points to favorable evidence and testimony for its position, but a showing of clear error requires more. We must be "'left with the definite and firm conviction that a mistake has been committed.'" Easley v. Cromartie, 532 U.S. 234, 242 (2001) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). That is not the case here. Accordingly, we decline to disturb the district court's finding that the

17

United States did not cause any of the TCE contamination on Horry Land property, and therefore was not a potentially responsible party for any CERCLA liability on that land.

## III.

Finding no error, we affirm the judgment of the district court.

AFFIRMED